**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MARINA KONDRATSKAIA,

                  *Plaintiff,*

    v.

EQUITAS CAPITAL GROUP, LLC and
ALEKSANDR LEYKIND a/k/a ALEX
LEYKIND,

                *Defendants.*

---

Case No. 1:25-cv-02620

**AMENDED COMPLAINT**

Plaintiff Marina Kondratskaia ("Kondratskaia" or "Plaintiff"), by and through her undersigned counsel, asserts as follows:

**<u>NATURE OF THE CASE</u>**

1.    This is a civil action brought by Kondratskaia, a commercial real estate loan professional, against her former employers. Kondratskaia worked exclusively for Defendants for more than five years, often working nights and weekends. Under the parties' agreement, Kondratskaia was paid strictly on the basis of commercial loan transactions she facilitated, and only after the transactions were completed. She worked on dozens of pending transactions at a time, but her job did not involve sales or brokering; instead, she was tasked with handling all the administrative steps involved in seeing the loan transactions through to consummation.

2.    Under the parties' agreement, Kondratskaia was entitled to 35% of Defendants' revenue from such transactions. However, in 2023 and 2024 Defendants began to change this agreement, informally and unilaterally, to Kondratskaia's detriment. As further detailed herein, these changes were unlawful in several respects.

3.    At the end of 2024, Kondratskaia was denied further work opportunities (albeit not

formally terminated).

4.      Kondratskaia alleges several distinct contractual or quasi-contractual claims which may be bolstered by various statutory protections depending on whether she is viewed a freelancer or an employee:

a.  First, Kondratskaia alleges that at the time she was denied further work opportunity, a certain subset of transactions were either complete or substantially complete but for formalities, and that she is entitled to payment for such transactions.

b.  Second, Kondratskaia alleges that at the time she was denied further work opportunity, she had already invested significant amounts of time and energy for a different subset of transactions which were not complete, for which she was never given an opportunity to see through to completion and receive commission.

c.  Third, Kondratskaia alleges that starting in 2023 and on various occasions thereafter, Defendants began to improperly change the terms of her compensation with regards to transactions that were *already* in progress (i.e., moving the goalpost during the game). In other words, for yet another certain subset of relevant transactions, she was pressured to accept less than agreed-upon compensation for work already performed.

5.      On these facts, Kondratskaia alleges manifold alternative claims including violations of New York Labor Law (the "NYLL"), the Freelance Isn't Free Act ("FIFA"), as well as common law claims for breach of contract, breaches of the implied covenant of good faith and fair dealing, and quantum meruit / restitution.

## PARTIES

6.      Kondratskaia is an individual domiciled in Pennsylvania.

7.      Kondratskaia previously resided in Brooklyn, New York, until 2021.

8.      Defendant Equitas Capital Group, LLC ("Equitas") is a company formed under the laws of the State of New York with its principal place of business at 3121 Ocean Ave, Suite #504, Brooklyn, NY, 11235.

9.      Defendant Aleksandr Leykind, also known as Alex Leykind ("Leykind") is an individual residing in and conducting business in New York.

10.     All Defendants are collectively referred to as "Defendants" herein.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, *et seq*., because Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.

12.     Equitas Capital Group, LLC, is fully owned by three individuals, including Leykind, all of whom are domiciled in New York.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred within this judicial district.

## FACTS

14.     Kondratskaia is a forty-eight-year-old finance professional with a combined Bachelor's and Masters' degree in Banking and Finance.

15.     Equitas is a commercial loan originator and commercial mortgage advisor that regularly sources loans in, generally operates in, and conducts business within New York City.

16.     In March 2020, Kondratskaia was recruited by Equitas to serve as an underwriter, loan analyst and closer.

17.      From then until late 2024, Kondratskaia diligently worked for Equitas and assisted it in closing over $600 million dollars' worth of loan transactions.

18.      The loan transactions were exclusively commercial (i.e. not residential mortgages) and generally issued to borrowers in and around New York City.

19.      During her tenure, Kondratskaia worked on more than 200 deals for Defendants, of which at least 150 closed.

20.      The nature of Kondratskaia's role involved: working with a client (a prospective borrower) to gather pertinent financial documents that a lender would need to consider a potential loan/mortgage; using those documents to generate bespoke financial reports/analysis; procuring and organizing other, non-financial information about a prospective borrower and combining it with financials to produce a complete presentation which would be submitted to lenders; working with clients and lenders to provide any additional information needed for the lender to provide a potential 'term sheet'; then, if a term sheet had been issued, working with clients/lenders to gather and organize all necessary diligence documents for the loan to close, such as appraisal documents and related reports (e.g. environmental assessments); and finally, certain post-closing tasks.

21.      The entire process of such a transaction typically took around four to six months to complete.

22.      Although Kondratskaia only received any kind of compensation when and if a transaction closed, she performed a substantial amount of work for which she was not compensated, including certain tasks she was directed to perform by Defendants to evaluate potential deals, working on deals that fell through for various reasons, and complying with Defendants' requirements for all their workers such as attending meetings and filling out forms.

### *The Parties' Agreement*

23.     At the outset of the parties' commercial relationship, the parties agreed that Kondratskaia would be compensated on the basis of completed transactions only.

24.     Although the parties' agreement was at least partially memorialized in certain written communications, it was not reduced to a traditional contract.

25.     Discovery may be required to determine the exact terms of the parties' agreement.

26.     Upon information and belief, Defendants made a pattern and practice of not reducing their agreements with employees and/or independent contractors to writing.

27.     Plaintiff may be entitled to certain presumptions under applicable law, as further detailed below, arising from Defendants' failure to provide and preserve written contractors for its employees and contractors.

28.     The parties agreed that Kondratskaia would be entitled to an amount equal to 35% of Equitas' revenue for any deals she worked on, net of referral fees.

29.     This agreement provided, either expressly or impliedly, that Kondratskaia would be paid her 35% regardless of whether or not she was still working for Equitas at the time the relevant revenue was collected.

30.     Upon information and belief, the parties' agreement did not set forth whether Kondratskaia was an independent contractor or an employee.

31.     For the first three years of her tenure, Equitas paid the agreed-upon 35% to Kondratskaia for every deal she helped to close.

32.     Then, in 2023, Defendants began to unilaterally change the terms of the parties' agreement, even for deals for which Kondratskaia had already invested a significant amount of time and energy.

33.     Specifically, Leykind informed Kondratskaia that he felt she needed assistance and

that he was hiring 'advisors' or 'assistants' for Defendants who would help Kondratskaia on deals she worked on, but that in exchange for this (unsolicited) assistance, she was required to share her commission with such advisors/assistants, such that her commission would be reduced by 5 or 10% (to 30% or 25%).

34.     In the months and years that followed, on numerous occasions Defendants sought to rewrite the terms of the parties' Agreement in this fashion.

35.     Again, these changes were made on certain deals even after Kondratskaia had commenced work on such deal.

36.     As another example, Kondratskaia was periodically pressured to simply accept less than the parties' agreed-upon commission percentage for various reasons.

37.     In one such instance, she was pressured to accept a lower commission than what she was owed simply because she had taken a week off (even though her time off had been the first true vacation she had ever taken while working for Defendants).

### *The Parties' Relationship Ends*

38.     In early November 2024, Defendants called an 'all hands' meeting in Equitas' Brooklyn office, which Kondratskaia was required to attend in person.

39.     In that meeting, Defendants announced that all "managers" (the term Defendants generally used to describe Kondratskaia's role) should expect revisions to their compensation scheme.

40.     Kondratskaia hoped that these changes would finally result in more clarity and predictability about her compensation, which by that point seemed completely arbitrary, given that since 2023, the 35% she originally agreed to had to been increasingly susceptible to mandatory reductions based on ever-changing staffing strategies or discounts to clients.

41.     In November 2024, Kondratskaia's mother had a heart attack. This required her to take time off to attend to her ailing mother.

42.     Kondratskaia immediately informed Defendant Leykind that she would need to take leave from her work for Defendants in order to see and care for her mother.

43.     During her leave, Kondratskaia contacted Defendants to provide an estimate of her return date, so that Defendants could return her laptop.

44.     She received a response from Leykind's assistant telling her that he would need to "confirm with Alex [Leykind]." She never received a follow-up

45.     When she returned on December 15, 2024, she informed Leykind that she was ready to resume her duties, he responded that he needed to "get back to her."

46.     But he never did.

47.     Kondratskaia's relationship with Defendants was never terminated, at least not in any formal sense.

48.     She simply never received any further work opportunities from Defendants; after five years of long hours, they simply "ghosted" her.

49.     Upon information and belief, Defendants denied Kondratskaia further work opportunities in an effort to avoid paying her agreed-upon compensation (or any compensation at all) for deals on which she had already performed a substantial amount of work.

**Unpaid Compensation**

50.     At the time of her separation from service, Kondratskaia was working on more than a dozen transactions in her pipeline.

51.     She had already invested a substantial amount of time facilitating all of these deals.

52.     A number of them were completed but for formalities.

53.      For example, for a particular $6.5 million dollar loan on a property located in the Bronx, Kondratskaia estimates that she worked approximately 175 to 210 hours, most of which occurred in fall 2024.

54.      This included initial analysis, development of models and deal presentation submission, searching for lenders, developing a term sheet, and the underwriting process.

55.      By the time she was denied further work opportunity, Kondratskaia's role with the project was virtually complete and the parties were just waiting for the closing to occur.

56.      Other projects/transactions were not completed but were well under way towards completion.

57.      For example, for a particular 'package deal' for refinancing of two properties in the Sheepshead Bay area of Brooklyn, Kondratskaia estimates that she worked approximately 350 to 220 hours (between the two related deals), most of which occurred in summer and fall of 2024.

58.      By the time she was denied further work opportunity, Kondratskaia estimates that the project was 80% complete (in terms of its progression towards realized revenue for Defendants).

59.      When she returned her laptop to Defendants, Kondratskaia lost all access to information related to her work with Defendants.

60.      Although Kondratskaia had already invested a significant amount of time and energy into these deals (for which she was not paid anything), she lost the opportunity to see them through to completion and obtain her 35% compensation, which was the sole form of compensation under the parties' agreement.

61.      Pursuant to the parties' agreement, Kondratskaia is entitled to the 35% for any such transaction that has closed or closes in the future.

62.     To the extent the parties' agreement is unclear on this point, it must be construed in Kondratskaia's favor under applicable law.

63.     Should the Court find that Kondratskaia is not entitled to the full 35% for any particular transaction, it should find that she is nonetheless entitled to reasonable compensation for the value of her services in relation to such transaction, given that she was not compensated in any other way (e.g., by a base hourly rate or salary for her labors).

64.     Because she no longer has access to complete and/or up-to-date records regarding her sales pipeline or information related to the status of the transaction therein, Kondratskaia does not know the exact amount of commissions she is owed.

65.     However, Kondratskaia estimates that she is owed as much as $220,000, depending on the status/resolution of each of the transactions upon which she was working.

***The Parties' Legal Relationship***

66.     Through her tenure at Equitas, Kondratskaia was paid on a 1099 basis.

67.     However, in all other respects, Kondratskaia was clearly Defendants' employee.

68.     As a matter of economic reality, Kondratskaia depended upon Defendants for the opportunity to render services.

69.     Defendants exercised a high degree of control over Kondratskaia.

70.     When Kondratskaia started working with Defendants, she was asked to undergo a period of "shadowing" during which she was trained in their methods and processes.

71.     Defendants required Kondratskaia to attend weekly meetings and periodic training presentations.

72.     Defendants required Kondratskaia to use various systems that served as channels for this control, including internal Agile system, emails, and Dropbox.

73.     Defendants imposed a specific required timeframe for delivery and execution of each workflow step in Kondratskaia's performance of her job, from the initial deal assignment through closing and beyond.

74.     Leykind served as Kondratskaia's supervisor, and he maintained extensive control over how, when, and where her work was done.

75.     Kondratskaia communicated (and was required to communicate) with Leykind for each material stage or event in the progression of each deal she worked on.  She only made significant decisions after his review and approval. Only after such approval was obtained could she proceed with any significant step in the transaction process.

76.     Leykind also directed Kondratskaia as to the order of priority she maintained for her various deals.

77.     When the company had "all-hands" calls with all of its employees, Kondratskaia was always expected to attend.

78.     Kondratskaia was expected to meet deadlines as frequently as daily, such as deadlines to provide final documentation for deals, deadlines for periodic internal reports, and deadlines to respond to a variety of other deliverables that were frequently requested by Defendants' management on a daily basis.

79.     During business hours, Kondratskaia was expected to be in front of her computer and answer emails/calls from Equitas' clients or her supervisor, Leykind, as needed.

80.     At a certain point during Kondratskaia's tenure, Defendants announced to all their personnel that it planned to adopt a "vacation policy" of five (5) days per year.

81.     When Kondratskaia inquired to confirm that this applied to her, as a 1099, Defendants stated that it did apply to her.

82. Defendants required that Kondratskaia obtain approval for any such vacation plans / time off.

83. Although she generally worked remotely (from her home office), her work location was fixed. She did not typically need to travel around to perform her job functions.

84. Kondratskaia was also expected to attend a weekly "pipeline" call at 8:30 AM every Tuesday, wherein she was expected to provide an update/snapshot of her pending deals.

85. For the latter half of her tenure, Kondratskaia was required to do all her work for Defendants on a laptop provided by Defendants, at their expense, for that particular purpose.

86. Defendants also paid for several professional online services and subscriptions (PropertyShark, CoStar, Rentometer) that Kondratskaia used to perform her job.

87. At some point towards the latter half of her tenure, Kondratskaia was required by Defendants to sign a confidentiality agreement.

88. The agreement prohibited Kondratskaia from, among other things, attempting to take business away from Equitas, hiring its employees, or soliciting its vendors.

89. Kondratskaia had minimal opportunity for profit or loss, other than that which would be true of any employee paid on a commissions-only basis.

90. Kondratskaia never invested in Equitas or placed any capital-at-risk with either of the Defendants, nor was she ever invited to do so.

91. Kondratskaia never received any sort of distributions or profit-sharing from Equitas.

92. Although Kondratskaia had a high degree of skill and experience in carrying out her responsibilities, her role did not require the type of independent initiative typically attributed to an independent contractor.

93.     Kondratskaia did not source the deals she worked on for Defendants; Defendants sourced them and assigned them to her.

94.     There was substantial permanence and duration to the working relationship.

95.     Kondratskaia worked exclusively for Defendants, on a full-time basis, for more than four years.

96.     Other individuals who worked for Defendants' with very similar, if not identical, duties as Kondratskaia were categorized as employees by Defendants.

97.     The work that Kondratskaia performed was an integral part of Defendants' business.  Her role was at the core of Equitas' primary (if not only) profit-center.

98.     Upon information and belief, the parties never signed any agreement which sought to expressly designate Kondratskaia's role with Defendants as either an employee or an independent contractor.

99.     However, based on all of the facts above and the totality of the circumstances, Kondratskaia was Defendants' employee.

100.    Defendants did not engage in the manufacture, production, import or distribution of products for wholesale.

101.    Kondratskaia's position did not include any kind of sales or brokering; Defendants assigned all clients to her.

102.    Kondratskaia's position did not require her to solicit orders of any kind.

103.    Defendants did not systematically track or record the amount of time that Kondratskaia worked.

104.    Defendants did not ask Kondratskaia to systematically track her time worked or provide her with a means of doing so.

105.    Kondratskaia's work for Defendants regularly went outside business hours.

106.    She typically started working at 9 AM but often worked as late as 10 PM.

107.    She also worked on weekends for much of her tenure.

108.    When Kondratskaia took vacation, she always traveled with her work laptop and often had to interrupt her vacation to keep up with her responsibilities.

109.    Kondratskaia regularly worked well over 40 hours in a particular workweek.

110.    On many weeks, she worked as many as 60-70 hours.

111.    Defendants never paid Kondratskaia any overtime wages.

### *Joint Employers*

112.    Leykind and Equitas were joint employers of Kondratskaia.

113.    Leykind presents himself publicly as the principal of the company.

114.    Leykind was Kondratskaia's direct supervisor during the term of the parties' relationship.

115.    Leykind possessed the ability to terminate Kondratskaia.

116.    At all relevant times, Leykind maintained control, oversight, and direction over Kondratskaia, including over Kondratskaia's work and payments.

117.    Leykind held the power to hire and fire Equitas's employees, set wages and schedules, and maintain company records.

118.    Leykind controlled various aspects of Kondratskaia's employment with Equitas.

119.    Many of Kondratskaia's acts on behalf of Equitas were explicitly requested by Leykind directly for Equitas's and Leykind's mutual benefit.

120.    Defendants publicly held Kondratskaia out to be a representative of Equitas.

121.    At all relevant times, Equitas and Leykind were joint employers of Kondratskaia,

acted in the interest of each other with respect to Kondratskaia, and maintained common policies

and practices as to the payment to Kondratskaia, the schedule of payments, and the withholdings

and deductions to Kondratskaia.

## CAUSES OF ACTION

122.    Plaintiff incorporates by reference the preceding paragraphs for each Cause of

Action pleaded herein.

### FIRST CAUSE OF ACTION
**Breach of Contract**
(*Against both Defendants*)

123.    As detailed above, Defendants and Plaintiff entered into an Agreement pursuant

which Plaintiff would provide certain services.

124.    Plaintiff provided such services as required by the Agreement.

125.    Defendants breached the Agreement by failing to pay for such services in the

amount and manner set forth in the Agreement.

126.    Defendants are thus liable to Plaintiff for breach of contract.

### SECOND CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
(*Against both Defendants*)

127.    An implied covenant of good faith and fair dealing underlies every contract in New

York.

128.    A breach of the covenant is a breach of the agreement or contract itself, the covenant

being part and parcel of the agreement or contract.

129.    The covenant is breached when a party acts in a manner that deprives the other

party of the right to receive benefits under their agreement.

130.    The implied covenant of good faith and fair dealing provides—in the broadest terms
—that a party to a contract may not act to destroy the value of the contract to the other party.

131.    The implied covenant can be breached where one exercises a right within the
contract in a way that defeats the underlying expectations of the contract or frustrates the purpose
of the contract.

132.    Apart from the breaches of the parties' agreement set forth above, Defendants
frustrated and destroyed Plaintiff's contractual purposes and expectations arising under the
Agreement.

133.    By reason of the foregoing, Defendants are liable to Plaintiff in an amount to be
determined at trial.

### THIRD CAUSE OF ACTION
### Violations of City/State Freelance Isn't Free Acts for Nonpayment
### (*Against both Defendants*)

134.    To the extent the Court may find the Plaintiff was not an employee of Defendants,
Plaintiff was a "freelance worker" for as defined by the New York City Freelance Isn't Free Act,
NYC Admin. Code § 20-929 *et. seq.* ("City FIFA") and/or by New York's comparable Act, N.Y.
Gen. Bus. Law ("GBL"), Article 44-a (§ 1410 *et. seq.*) ("State FIFA").

135.    Plaintiff is "freelance worker" because she is individual or an organization
composed of no more than one natural person, who was hired or retained as an independent
contractor by a hiring party to provide services in exchange for compensation. City FIFA § 20-
927; State FIFA § 1410.

136.    Defendants were "hiring parties" because Defendants hired Plaintiff to provide a
service. City FIFA § 20-927; State FIFA § 1410.

137.    In violation of City FIFA § 20-929(a) and/or State FIFA § 1411(1), Defendants failed to pay Plaintiff for such services on or before the date such compensation was due under the terms of the contract (or no later than 30 days after the completion of the freelance worker's services under the contract).

138.    Both FIFA laws also require hiring parties to produce and retain written contracts with freelancers which set forth, among other things, "the value of the services to be provided pursuant to the contract, and the rate and method of compensation." State FIFA § 1412(2)(b); *see also* City FIFA § 20-928.

139.    State FIFA also holds "[t]he failure of a hiring party to maintain such contracts . . . shall give rise to a presumption that the terms that the freelance worker has presented are the agreed upon terms" and that "[f]ailure to comply with the provisions of this article does not render any contract between a hiring party and a freelance worker void or voidable or otherwise impair any obligation, claim or right related to such contract or constitute a defense to any action or proceeding to enforce, or for breach of, such contract." State FIFA § 1412(3) and § 1415(3).

140.    Therefore, a statutory presumption lies in favor of Plaintiff regarding the terms of the parties' agreement to the extent they are unclear as a result of Defendants' failure to document the terms of Plaintiff's compensation. The same presumption should arise under analogous precedential authority. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-88, 66 S. Ct. 1187, 1192 (1946).

141.    In violation of City FIFA § 20-929(b) and/or State FIFA § 1411(2), Defendants also demanded on numerous occasions that Plaintiff accept less than the parties' agreed-upon amount of compensation in exchange for timely payment after Plaintiff had commenced performance. State FIFA § 1411(2) ("Once a freelance worker has commenced performance of the

services under the contract, the hiring party shall not require as a condition of timely payment that

the freelance worker accept less compensation than the amount of the contracted compensation.").

142.    Pursuant to City FIFA § 20-933(b)(3) and/or State FIFA § 1414(3)(c), Plaintiff is

entitled to the full unpaid amount of her agreed-upon compensation and "double" the unpaid

amount as mandatory liquidated damages, plus interest and mandatory attorney's fees.

## FOURTH CAUSE OF ACTION
### Violations for late/unpaid commissions pursuant to NYLL Sections 191 and/or 193 *et seq.*
### *(Against both Defendants)*

143.    To the extent the Court may find the Plaintiff was an employee of Defendants, at

all times relevant to this action, Defendants were Plaintiff's employers within the meaning of the

New York Labor Law §§ 2 and 651.

144.    Pursuant to Article Six of the NYLL, workers such as Plaintiff are protected from

wage underpayments and improper employment practices.

145.    Pursuant to NYLL § 191, employers are liable for failure to pay an employee's

wages (including commissions earned) within a proscribed period of time.

146.    Pursuant to Labor Law § 193, employers are liable for the wholesale unauthorized

failure to pay wages, benefits or wage supplements.

147.     Defendants have failed to pay Plaintiff for duly-earned commissions pursuant to

the parties' agreement or agreements.

148.    Upon being earned, such commissions are considered as wages under the NYLL.

149.    Whether such wages are regarded as late or entirely unpaid, Defendants are liable

for such non-payment.

150.    Defendants' failure to comply with the NYLL was willful.

151.     Due to Defendants' violations of the NYLL, Plaintiff is entitled to recover from Defendants her unpaid wages (commissions), liquidated damages, reasonable attorneys' fees, costs, and prejudgment and post-judgment interest.

152.     Further, should the Court determine that Plaintiff was Defendants' employee, Plaintiff hereby provides notice of potential claims under other provisions of the NYLL as well as the Fair Labor Standards Act, 29 U.S.C. § 203 *et. seq.* (FLSA).  Such violations may include: (a) failure to pay Plaintiff overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek, in violation of FLSA § 207(a)(1) and NYLL § 190 *et seq.* (and supporting regulations), to the extent no regulator exemption applied to her position; (b) failure to comply with NYLL § 195(1) and (3), pursuant to which Defendants were required to provide Plaintiff at the time of hiring a wage notice (including "the rate or rates of pay and basis thereof, whether paid by the hour…commission, or other…") and a statement with every payment of wages that identifies the measure of payment. Plaintiff reserves the right to amend her pleadings to include such claims.

**FIFTH CAUSE OF ACTION**
**Quantum Meruit / Restitution**
(***Against both Defendants***)

153.     To the extent the Court may find that no enforceable contract was formed between the parties, or that less than all of the conduct detailed above was governed by a contract between the parties, Plaintiff alleges that an action in equity lies in her favor against Defendants.

154.     Plaintiff provided valuable services to Defendants in good faith.

155.     Plaintiff expected to be compensated for the services rendered at the time they were performed.

156.     Defendants accepted and/or benefited from Plaintiff's services.

157.    Defendants are liable to Plaintiff for the reasonable value of the services provided.

158.    It would be unjust and/or inequitable for Defendants to retain the benefit of Plaintiff's services without compensating the Plaintiff.

### DEMAND FOR JURY TRIAL

159.    Plaintiff respectfully demands a jury trial on all claims.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court award Plaintiff a judgment in Plaintiff's favor and against Defendants on all claims herein, including:

1) Awarding compensatory, punitive, and statutory/liquidated damages on all claims herein or such as may be permitted by this Court, in an amount to be determined.

2) That Plaintiff and counsel for same recover the costs of this suit, pre- and post-judgment interest, and attorney's fees as provided by law.

3) Such other and further relief as is just and proper.


Dated: July 15, 2025
         New York, New York




John J. Thompson, Esq.
THOMPSON & SKRABANEK, PLLC
515 Madison Avenue, 31st Floor
New York, New York 10022
(646) 568-4010
jt@ts-firm.com

*Attorneys for Plaintiff Marina Kondratskaia*